UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MARIIA SHEMIATINA,

Plaintiff,

-against-

UNITED STATES OF AMERICA

Defendant.

Civil Action No.  3:25-cv-00493 (FJS/ML)

## NATURE OF THE ACTION

1. In 2022, Mariia Shemiatina fled political persecution in Russia after publicly opposing the war in Ukraine.  When Ms. Shemiatina arrived in the United States, federal immigration authorities under the administration of President Joseph R. Biden, Jr. detained her for six months in the South Louisiana ICE Processing Center, a facility with a long-established history of abuse and neglect.  There, Ms. Shemiatina was held in appalling conditions.  Officers and agents of the United States—including ICE and CBP officers—confined Ms. Shemiatina in hazardous living conditions, verbally abused her, and, when she fell seriously ill, denied Ms. Shemiatina critical medical care such that she contracted a debilitating medical condition from which she continues to suffer today.  This mistreatment caused and continues to cause Ms. Shemiatina severe physical and emotional harm.  The conduct of these U.S. officers and agents was wrongful and negligent.  Ms. Shemiatina is entitled to recovery under the Federal Tort Claims Act for the emotional and physical injuries resulting from their acts and omissions.

## JURISDICTION AND VENUE

2. This Court has jurisdiction in this case, which arises under federal law, pursuant to 28 U.S.C. § 1346(b) (the Federal Tort Claims Act) because this is a civil action against the United States

for personal injury caused by the negligent and wrongful acts and omissions of government employees.

3.    Venue is proper under 28 U.S.C. § 1402(b) because Plaintiff resides in the Northern District of New York.

## PARTIES AND SERVICE

4.    Plaintiff Mariia Shemiatina is a 31-year-old lawful permanent resident of the United States, currently residing and domiciled in New York.

5.    Defendant UNITED STATES OF AMERICA may be served with process, in accordance with Rule 4(i) of the Federal Rules of Civil Procedure, through the United States Attorney's Office, Northern District of New York, New York.    A copy of the summons and complaint will be forwarded to the Attorney General of the United States, 950 Pennsylvania Ave., NW Washington, DC 20530-0001 via certified mail return receipt requested.

## STATEMENT OF FACTS

### I.    Ms. Shemiatina's Journey to the United States and Detention by Immigration Officers

#### A.    *Ms. Shemiatina Flees Russia and Seeks Asylum in the United States*

6.    Ms. Shemiatina is a physician.  She was born in Russia, where she resided until 2022.

7.    In Russia, Ms. Shemiatina faced political persecution for expressing political beliefs critical of the Russian government.  In particular, Ms. Shemiatina opposed the Russian invasion of Ukraine, and in February 2022, began using her social media accounts to express her opposition to the war.  Shortly thereafter, Ms. Shemiatina was fired from her job, and began receiving threatening messages from government officials.

8.    Based on news reports of action taken against political dissidents in Russia, Ms. Shemiatina understood that her political expression would likely result in arrest, solitary

2

confinement, and potentially torture or death.   Fearing imprisonment, physical, sexual and psychological abuse, torture, and death, Ms. Shemiatina and her husband, Boris Shevchuk, decided to flee Russia on or about March 13, 2022.  They chose to come to the United States, seeing it as a beacon of free speech, which they were deprived of in Russia.

9.     On or about April 30, 2022, Ms. Shemiatina presented herself at the Otay Mesa border crossing station in Southern California and requested asylum from U.S. Customs and Border Patrol ("CBP") officers.

10.     Although Ms. Shemiatina crossed the border at a designated port of entry and had an entirely legitimate basis for seeking asylum, she was detained for the next six months by CBP and U.S. Immigrations and Customs Enforcement ("ICE") under the Biden administration.  During her detention, Ms. Shemiatina suffered severe physical and emotional abuse and neglectful mistreatment.  Ms. Shemiatina was ultimately granted asylum in the United States on May 2, 2023.

### B.     *Ms. Shemiatina's Detention at San Ysidro*

11.  Ms. Shemiatina was first detained at a facility operated by CBP near San Ysidro, California ("San Ysidro") until approximately May 5, 2022.  At San Ysidro, she was arbitrarily separated from her husband, even though they were housed at the same facility, and held in unsafe and unsanitary living conditions.

12.  While at San Ysidro, Ms. Shemiatina was housed in an underground room, and was provided only a thin yoga mat to sleep on and a foil blanket to keep her warm.  Immigration Officers supplied token quantities of food (for example, a meal consisted of canned beans with lettuce). Further, despite the ongoing Covid-19 pandemic, the facility took almost no steps to protect detained people from communicable diseases.   Detained people, including those exhibiting symptoms of Covid, were housed in close living quarters, and CBP failed to provide masks or other protective equipment.  Ms. Shemiatina requested a Covid-19 vaccine, but ICE and CBP Officers

never administered one to her.

13. On or about May 1, Ms. Shemiatina reported to a CBP Officer that she was experiencing abdominal pain consistent with cystitis and gastritis, conditions which are treatable through diet and over-the-counter medication, along with flu-like symptoms as a result of the cold conditions and sleeping on a thin mat on concrete. ICE and CBP officers ignored Ms. Shemiatina's requests for medication to treat her gastritis and cystitis and her requests for meals that might mitigate her symptoms. Instead, ICE and CBP officers provided Ms. Shemiatina with generic painkillers.

14. On or about May 5, 2022, Ms. Shemiatina was transferred by plane and bus to the South Louisiana ICE Processing Center, located at 3843 Stagg Avenue, Basile, Louisiana 70515 ("Basile"), which was operated by officers of the Department of Homeland Security ("DHS"), ICE officers and other personnel acting under ICE's supervision, including employees of the GEO Group, Inc. (together with ICE officers, DHS officers, and CBP officers, "Immigration Officers"), until her release on or about November 3, 2022.

15. On information and belief, Basile is owned by the GEO Group, Inc. ("GEO Group") and is operated by officers and employees of the DHS, ICE, and CBP, as well as personnel acting under the supervision and control of DHS, ICE, and CBP, including but not limited to employees of the GEO Group. ICE and CBP officers, as well as other officers and agents of the United States, were present at Basile throughout Ms. Shemiatina's detention, directed the conduct of GEO Group employees, and observed the conditions in which Ms. Shemiatina was detained.

16. On information and belief, Defendant United States is responsible for supervising the conduct of Immigration Officers at Basile. At all relevant times during Ms. Shemiatina's detention, Immigration Officers acted within the scope of their employment with federal agencies, including

but not limited to ICE and CBP.

## II.    A Pattern of Abuse and Neglect at Basile

17.    For years prior to Ms. Shemiatina's detention, there were numerous credible reports documenting appalling conditions at Basile.  These reports described a pattern of medical abuse and neglect by Immigration Officers.  They also highlighted that detained people were held in facilities infested with insects and rodents, provided with inedible and insufficient food, deprived of other human necessities such as hygiene supplies and warm bedding, and denied access to legal resources and language services.

18.    A 2024 report on conditions in ICE facilities in Louisiana, for example, reported that Immigration Officers at Basile "served undercooked food, including raw chicken and frozen hard-boiled eggs," and that detained people were regularly served a piece of bread and slice of bologna as a meal.[1]  Another report recounted that a full day of food at Basile consisted of "five nuggets, two breads, [and] a cup of rice."[2]  As a result of malnutrition, several women reported losing their menstrual cycles at Basile.[3]  One woman at Basile also reportedly "relied on melted ice for potable water," as the tap water at the facility was "discolored and had a foul odor."[4]

19.    Other reports highlighted the unsanitary conditions at Basile.  A report submitted to DHS noted that women at Basile reported rat and mosquito infestations, along with black mold, in the housing units.[5]  The report further observed that detained people were deprived of basic hygiene

---

[1]    *See* Inside The Black Hole, Systemic Human Rights Abuses Against Immigrants Detained & Disappeared in Louisiana, ACLU *et al.* (Aug. 26, 2024) [hereinafter the "RFK Report"], https://www.laaclu.org/sites/default/files/inside_the_black_hole_systemic_human_rights_abuses_against_immigrants_detained_disappeared_in_louisiana.pdf.

[2]    *See* News Release, *Students Document Reports of Abuse at Immigration Detention Center*, Yale Law School (Jan. 17, 2025) [hereinafter the "Yale Law Complaint"], https://law.yale.edu/yls-today/news/students-document-reports-abuse-immigration-detention-center.

[3]    RFK Report at 43.

[4]    *Id.*

[5]    RFK Report at 44.

supplies, including toilet paper, menstrual products, and soap, and instead had to rely on goodwill of facility staff or other detained people to procure commonplace and critical hygiene products.[6]

20. During the Covid-19 pandemic, multiple news articles highlighted the lack of precautions Immigration Officers instituted at Basile to protect detained people from contracting and spreading the virus. One article noted that women at Basile staged peaceful demonstrations protesting the conditions at Basile, whose cramped living quarters and lack of personal protective equipment exacerbated the spread of Covid-19 among detained people and facility staff.[7]

21. ICE's own official reports similarly documented inadequate care and general chaos at Basile. In October 2022, weeks before Ms. Shemiatina's release, the Office of the Immigration Detention Ombudsman ("OIDO") conducted an unannounced inspection of Basile and found the facility had failed to comply with a wide range of ICE policies regarding medical care, including "insufficient medical staffing levels," "improperly monitored negative-pressure isolation rooms," "lack of detainee privacy during telehealth sessions," untimely intake screenings and sick call request responses, "out-of-date instructions for requesting health care services," "inaccurate logging and untimely resolution of medical grievances," and inconsistent testing for Covid-19 on intake.[8] The OIDO report also noted that Basile had a mosquito infestation in its urgent care room, failed to properly keep track of firearms, and failed to enforce required annual emergency response training for critical emergency situations, including cardiopulmonary resuscitation (CPR) and suicide intervention.

---

[6]     *See* Yale Law Complaint at 2.
[7]     *See* Richard Hall, *Women detained at ICE facilities release videos in plea for help over coronavirus*, Independent (April 7, 2020), https://www.independent.co.uk/news/world/americas/coronavirus-ice-facility-louisiana-immigration-women-covid-a9454006.html.
[8]     *See* Inspection of South Louisiana ICE Processing Center, Memorandum from Michelle Brane, Ombudsman, Office of the Immigration Detention Ombudsman, to Patrick J. Lechleitner, Deputy Director and Senior Official, U.S. Immigration and Customs Enforcement (Aug. 2, 2024), https://www.dhs.gov/sites/default/files/2024-08/24_0802_oido_final-inspection-report-south-louisiana-ice-processing-center-508.pdf.

6

III. **At Basile, Immigration Officers Subjected Ms. Shemiatina to Unsafe Living Conditions and Failed to Treat Her Medical Conditions**

22.   Ms. Shemiatina was detained at Basile from on or about May 5, 2022, until on or about November 3, 2022.   In those six months, Immigration Officers subjected Ms. Shemiatina to dangerously unsafe living conditions, which caused her health to deteriorate precipitously; routinely denied Ms. Shemiatina critical medical care; verbally abused her; violated her privacy; exposed her to communicable diseases; and denied her access to legal services.   As a result of  Immigration Officers' mistreatment, Ms. Shemiatina suffered severe health issues and emotional trauma that persist to the present day.

23.   Throughout her detention in Basile, Ms. Shemiatina was held in barracks, which had dirty and torn mattresses.   Many of the sinks and toilets in the barracks were broken or otherwise unusable.   Ms. Shemiatina was not provided with a pillow to sleep on, and was instead only provided two sheets and a thin blanket containing tears and holes.

24.   The boxes of food provided to Ms. Shemiatina contained cockroaches, and the drinking water had a strong chemical smell.   The food and milk which Immigration Officers provided to Ms. Shemiatina were often spoiled or expired.   On several occasions, Ms. Shemiatina was denied food for more than a day.   While at Basile, Ms. Shemiatina saw bugs, spiders, and snakes inside the facility.

25.   Soon after arriving at Basile, Ms. Shemiatina's health began to deteriorate rapidly.   On or about May 7-8, 2022, Ms. Shemiatina began to experience severe symptoms of cystitis, including irritation and the presence of blood during urination.   As a result of the low temperatures at Basile and only having a thin, torn blanket for warmth, Ms. Shemiatina also began experiencing symptoms of hypothermia.   She submitted a medical request form on a facility-provided tablet (a "Medical Request Form") to address these symptoms, but received no medical treatment.

26.  On or about May 10, 2022, Ms. Shemiatina again submitted a Medical Request Form stating that she had "pain during and after urination," and that she needed to see a doctor and receive medication.  On or about May 12, 2022, Ms. Shemiatina made a complaint to OIDO regarding her urgent, unmet needs for medical treatment.  On or about May 11-13, 2022, Ms. Shemiatina was seen by Dr. Heinen at Basile's medical services, who prescribed a five-day course of antibiotics, as well as generic painkillers.  This treatment had little effect and Ms. Shemiatina continued to experience significant discomfort.

27.  In the following weeks, Ms. Shemiatina continued to suffer from untreated cystitis and gastritis, and developed new symptoms stemming from Basile's spoiled and inedible food and unclean water.  A few weeks after arriving at Basile and eating the facility's food, Ms. Shemiatina began experiencing disruptions in her menstrual cycle, pelvic pain, nausea, itchiness, inflammatory rashes on the lower half of her face, and hair growth on her chin.  A doctor at Basile prescribed Ms. Shemiatina a vegetarian diet to address her hormonal symptoms caused by Basile's food, but Immigration Officers generally did not provide Ms. Shemiatina with vegetarian options.  Ms. Shemiatina's menstrual cycle only normalized months later, after Immigration Officers finally provided her with kosher or vegetarian meals rather than forcing her to eat the spoiled and contaminated food from Basile's kitchen.

28.  On or about May 29, 2022 and again on or about June 5, 2022, Ms. Shemiatina experienced significant pain in her chest and flu-like symptoms indicative of Covid-19, and submitted Medical Request Forms, which were ignored by Immigration Officers.  On or about May 31, 2022, Ms. Shemiatina saw a nurse and communicated her flu-like symptoms, concerns about missing her menstrual cycle, and pain in her lower abdomen.  The nurse did not administer a Covid-19 test despite Ms. Shemiatina's flu-like symptoms, but prescribed Ms. Shemiatina anti-histamines.

8

On or about June 8, 2022, Ms. Shemiatina submitted another Medical Request Form stating that she was suffering from pain and discomfort in the lower left side of her abdomen and that there was blood in her urine. Ms. Shemiatina was called to a waiting area of Basile's medical services, but after making her wait for over four hours, Immigration Officers sent her back to her cell without medical attention. She later received painkillers and laxatives, which did nothing to alleviate her symptoms.

29. Sometime in early June, Ms. Shemiatina made complaints to the local OIDO regarding the facility's failure to address her symptoms, but the OIDO was dismissive of Ms. Shemiatina's reports. At an appointment with Dr. Heinen soon after, Dr. Heinen expressed irritation with Ms. Shemiatina and her requests for medical care. Dr. Heinen dismissed Ms. Shemiatina's severe and worsening symptoms and continued to prescribe only laxatives and generic painkillers.

30. On or about July 8, 2022, after weeks of untreated pain, Ms. Shemiatina managed to get another appointment at medical services following repeated requests for treatment. Dr. Heinen agreed to recommend that Ms. Shemiatina see a gynecologist at an external health care facility, but prescribed only painkillers and laxatives, which continued to do nothing to relieve Ms. Shemiatina's symptoms.

31. On or about July 28, 2022, Ms. Shemiatina submitted another Medical Request Form noting that the pain in her lower stomach had not subsided for two months, that she could not get necessary medical treatment at Basile, and that she needed to go to a hospital. Immigration Officers did not respond to these requests for over a month, and Ms. Shemiatina was not provided with any additional medical treatment to address her worsening symptoms.

32. On or about August 8-12, 2022, after months of grossly inadequate medical care and continued deterioration in her health due to the facility's conditions, Ms. Shemiatina participated in

9

a hunger strike.  At the time, Ms. Shemiatina was experiencing persistent nausea and had developed a rash all over her body, which became more severe every time she ate the spoiled food provided to her.  Before resorting to a hunger strike, Ms. Shemiatina attempted to find other food options, including requesting vegetarian meals, but these requests were ignored.

33.    On or about August 9, 2022, an Immigration Officer threatened to have Ms. Shemiatina deported if she did not end her hunger strike.  Later, that same Immigration Officer instructed Ms. Shemiatina to pay a bond in order to seek medical treatment outside of Basile.  Ms. Shemiatina was unsure whether it was even possible to pay bail, and in any event lacked the funds to do so.  After Ms. Shemiatina ended her hunger strike, Immigration Officers agreed to provide Ms. Shemiatina with kosher food from an off-site provider, in keeping with Dr. Heinen's prescription for Ms. Shemiatina's diet made months earlier.  Shortly after eating kosher food instead of Basile's spoiled and inedible food, Ms. Shemiatina's menstrual cycle normalized again.

34.    On or about August 29, 2022, Ms. Shemiatina was told that she would be taken to an off-site gynecologist, and was called to Basile's medical services early in the morning.  She was then made to wait for hours before being instructed to return to her dorm without receiving medical care.  Ms. Shemiatina proceeded to file complaints on a facility-provided tablet to medical services and to ICE, after which she was called back to medical services and taken to her off-site appointment.

35.    Two Immigration Officers escorted Ms. Shemiatina to her gynecological appointment, and one Immigration Officer remained with Ms. Shemiatina at her side throughout her gynecological examination, even though Ms. Shemiatina asked her to stand outside the room.  There were no curtains or other barriers to protect Ms. Shemiatina's privacy during an invasive examination which required Ms. Shemiatina to be naked from the waist down.  Following the

appointment, Ms. Shemiatina filed a complaint with PREA (a Prison Rape Elimination Act resource for people who have experienced sexual or physical abuse) for the Immigration Officer's violation of privacy during her gynecological examination. When Ms. Shemiatina spoke to a representative from PREA, she was pressured to drop her complaint, and was eventually told that it was facility policy that officers must be in the room during doctors' visits outside the facility.

36. Later that evening, after Ms. Shemiatina had been taken back to Basile, she began to experience bleeding, chills, and strong pain in her lower abdomen. She sent a request through the facility tablet indicating she needed urgent medical help. The next day, on or about August 30, 2022, Ms. Shemiatina was called into medical services. She waited for four hours outside of medical services, all while experiencing the same symptoms of bleeding, chills, and strong pain of the day before. Despite the severity of Ms. Shemiatina's symptoms, Immigration Officers at the facility's medical services forced Ms. Shemiatina to stand outside the office, refusing her requests to lie down.

37. Sometime during this hours-long wait for medical treatment, an Immigration Officer told Ms. Shemiatina that if she paid her bail that day she would be released from detention and could get the medical assistance she needed outside Basile. As in the past when Immigration Officers instructed Ms. Shemiatina to pay a bond, Ms. Shemiatina was unsure whether it would be possible for her to pay bail and lacked the requisite funds. Subsequently, Immigration Officers demanded that she sign a refusal of medical care form, which Ms. Shemiatina initially refused to do. However, after more time passed without receiving treatment, and desperate to lie down as she experienced bleeding and strong abdominal pain, Ms. Shemiatina felt that she had no choice but to sign the refusal of medical care form. After she signed the form, Immigration Officers finally allowed her to lie down in her dorm.

11

38.   On or about September 2, 2022, Ms. Shemiatina had an appointment with a doctor at Basile to discuss the neurological symptoms she had begun experiencing, including tingling sensations in her left arm and leg, dizziness, and decreased vision in her right eye.  The facility doctor again dismissed her symptoms.  Instead of treating Ms. Shemiatina, the facility doctor asked when Ms. Shemiatina thought she would be released from custody, and seemed frustrated with Ms. Shemiatina's simple pleas for medical care.

39.   On or about September 4, 2022, Ms. Shemiatina filed a facility grievance form describing her neurological symptoms and medical services' failure to provide treatment.  Ms. Shemiatina was knowledgeable about her symptoms, and requested an MRI because she believed her symptoms could be connected to her gynecological problems.  Her requests were again ignored.

40.   On or about September 7, 2022, Ms. Shemiatina requested her medical records through a facility-provided tablet.  Only upon reviewing her medical records did Ms. Shemiatina discover she had an ultrasound appointment scheduled with an off-site gynecologist, and that she had missed the appointment because Immigration Officers failed to inform her of the appointment or escort her to the off-site gynecologist.  Later that day, she met with a new doctor at Basile's medical services and spoke to him about her gynecological and neurological symptoms.  She again received no treatment for these conditions.

41.   On or about September 14, 2022, Ms. Shemiatina was scheduled for a gynecological appointment, but the appointment was cancelled without explanation.  Medical records indicate that the appointment was rescheduled because the facility did not timely complete the necessary medical testing and reports required for Ms. Shemiatina's appointment.

42.   On or about September 21, 2022, when an off-site gynecological appointment actually materialized, doctors prescribed her medication but told Ms. Shemiatina that she was fine, despite

12

the fact that she left the appointment bleeding abnormally. During and after the examination, the gynecologist consistently looked to Immigration Officers who were present for their approval of his conversations with Ms. Shemiatina. At all off-site medical appointments, Ms. Shemiatina was accompanied by two Immigration Officers who were present at all times when she spoke with doctors.

43. On or about September 29, 2022, Ms. Shemiatina was finally given the MRI she had requested weeks earlier at an off-site medical facility. She requested the results of her MRI, but medical staff denied her request. Instead, the MRI technician gave the disc containing Ms. Shemiatina's MRI images to an Immigration Officer to take back to Basile. Ms. Shemiatina was only informed of her results days after Immigration Officers received them, and had no control over her confidential medical information in the interim.

44. On or about October 2, 2022, Ms. Shemiatina submitted a Medical Request Form from her housing unit, stating that her condition was deteriorating and that she was experiencing severe dizziness and nausea, along with numbness on the left side of her body.

45. On or about October 5, 2022, Ms. Shemiatina woke up in medical services in restraints, without knowing how she got there. She experienced strong neck, face and arm spasms, and severe pain in her ears. A doctor performed "tests" that involved thrusting a metal object into her ears and painfully pressing on her toes with a metal implement. She also remembers Immigration Officers standing around her (who she later learned were filming her), mocking her and laughing, asking why she was sad, all while Ms. Shemiatina was immobile. Ms. Shemiatina lost consciousness again. When she awoke, she was in the hospital. Immigration Officers sought to return Ms. Shemiatina to Basile, but a doctor insisted that she remain at the hospital given her symptoms and her MRI report. Records from this hospital visit note that Ms. Shemiatina had been having strange

13

neurological symptoms, and that she was diagnosed with dizziness and paresthesia (numbness/pins and needles) in her left arm and leg, substantiating the symptoms she had been reporting for months. Sometime later, Ms. Shemiatina's spasms stopped, but she experienced strong tremors, dizziness, and new pain in her ears and toes that appeared to have been caused by the "tests" she was subjected to at Basile.

46.  On or about October 12, 2022, Ms. Shemiatina required hospitalization yet again. Records from this hospital visit indicate that Ms. Shemiatina had been unable to move her left arm and leg for approximately four weeks prior to the visit.  While hospitalized, two Immigration Officers were in the room with her at all times.  At some point during an initial examination, Ms. Shemiatina was subjected to another test entirely unrelated to her symptoms, during which doctors forced a metal object under her toenail.  The "test" caused bleeding and an injury that lasted for weeks.  Soon after this test, Ms. Shemiatina was taken to another hospital where doctors took the drastic step of performing a lumbar puncture, which entails inserting a thick needle into the spine. Following this procedure, Ms. Shemiatina continued to experience severe pain and was nearly immobile.  She also suffered from excruciating headaches and further abdominal issues.

47.  On or about October 25, 2022, Ms. Shemiatina's untreated symptoms and immobility became so severe that Immigration Officers had no option other than to have her admitted to inpatient rehabilitation.  Hospital records from Our Lady of Lourdes Regional Medical Center on October 25, 2022 indicate that Ms. Shemiatina had gynecological problems for three to four months while in ICE detention.

48.  On or about October 31, 2022, Ms. Shemiatina returned to Basile from inpatient treatment, but still experienced partial paralysis.  Following her hospitalization, Ms. Shemiatina could not move without assistance, and could not use the bathroom or bathe independently.  Upon

her return to Basile, Ms. Shemiatina was placed in an extremely cold medical isolation room.  This room contained no soap or toiletries.  When Ms. Shemiatina asked Immigration Officers for help in performing necessary actions like using the toilet or shower, those Immigration Officers mocked her and told her she had to use the restroom by herself despite her partial paralysis.  Unable to reach the toilet independently, Ms. Shemiatina was forced to use a trashcan near her bed as a toilet, and soon after developed a severe cold.  Ms. Shemiatina was kept in the medical isolation room until on or about the day of her release.

49.  Following her detention by ICE, Ms. Shemiatina was finally able to access specialty medical care.  She was subsequently diagnosed with a serious long-lasting disease of the central nervous system, which causes various neurological symptoms including pain, fatigue, trouble walking, numbness and tingling, vision problems, depression, and muscle weakness.  Although Ms. Shemiatina exhibited many of these exact symptoms throughout her detention, medical personnel time and again failed to provide a diagnosis and render appropriate treatment.

50.  As a result of ICE's failure to accommodate Ms. Shemiatina's disabilities or to provide Ms. Shemiatina with necessary medication and medical care, Ms. Shemiatina suffered severe physical deterioration during her detention by the United States, including but not limited to severe pain, abnormal bleeding, and neurological symptoms that left her almost completely immobile. These symptoms were documented in a form which Ms. Shemiatina received in upon her release, which chronicled the numerous, serious diagnoses that Ms. Shemiatina developed during her detention.

51.  As a result of her treatment by ICE and Immigration Officers, Ms. Shemiatina continues to experience a number of neurological, physical and mental issues through the present day, suffering from pain and fatigue, partial paralysis, muscle weakness, numbness and tingling,

cognitive issues, anxiety, and depression.

### IV. Immigration Officers Obstructed Ms. Shemiatina's Access to Legal Services

52. Immigration Officers consistently obstructed Ms. Shemiatina's access to legal services in retaliation for Ms. Shemiatina advocating for medical care in the face of her physical and mental deterioration. Ms. Shemiatina did not have access to legal representation until July 2022, months after she and her husband lawfully presented themselves at the border. As a non-English speaker, she found it especially difficult to navigate her immigration proceedings.

53. Once Ms. Shemiatina retained the services of attorney Jessica Gutierrez, Immigration Officers repeatedly attempted to limit Ms. Shemiatina's ability to contact and communicate with her lawyer in retaliation for Ms. Shemiatina's reporting the physical and emotional abuse by Immigration Officers. Immigration Officers also prevented Ms. Shemiatina from accessing evidence to support her asylum claims in her immigration proceedings.

54. For example, on or about October 4, 2022, Ms. Shemiatina called Ms. Gutierrez to discuss her urgent medical needs and Basile's failure to provide sufficient medical care. On or about October 5, 2022, Ms. Gutierrez tried to contact Ms. Shemiatina at Basile, but Immigration Officers falsely told Ms. Gutierrez that Ms. Shemiatina had refused to speak to her.

55. This pattern recurred throughout Ms. Shemiatina's detention, up to and through Ms. Shemiatina's release on November 3, 2022, when Immigration Officers once again prevented Ms. Gutierrez from communicating with Ms. Shemiatina.

### V. Immigration Officers' Treatment of Mr. Shevchuk Caused Ms. Shemiatina Additional Harm

56. In addition to inflicting severe emotional harm on Ms. Shemiatina through dangerous living conditions and grossly inadequate medical care as described above, Immigration Officers inflicted severe emotional harm on Ms. Shemiatina by (i) separating her from her husband, Mr.

16

Shevchuk, and hindering her ability to communicate with him throughout her detention; and (ii) assaulting and mistreating Mr. Shevchuk during his detention at Pine Prairie ICE Processing Center in Pine Prairie, Louisiana ("Pine Prairie").

57. As a result of Immigration Officers' misconduct, Mr. Shevchuk continues to suffer physical and emotional injuries today. The physical and emotional harm Mr. Shevchuk has endured has had a lasting and irreparable impact on the relationship between Ms. Shemiatina and Mr. Shevchuk, including through a loss of love and affection, loss of felicity, loss of companionship, and a loss of performance of material services, causing Ms. Shemiatina to experience a loss of consortium and severe emotional harm.

## VI.  The United States Was on Notice that Conditions at San Ysidro and Basile Were Unsafe and Unsanitary

58. The United States, DHS, ICE and CBP—all operating under the direction of appointees of the Biden administration—were aware of the unsafe and unsanitary conditions at San Ysidro and Basile, which caused Ms. Shemiatina's injuries. As set forth above, Basile has a public and ugly history of abuse, unsafe conditions, and insufficient and neglectful medical care.

59. Numerous ICE Officers and other U.S. government officers were present at San Ysidro and Basile during Ms. Shemiatina's detention and personally observed the conditions in which detained people were held. In addition to being present at both San Ysidro and Basile to witness facility conditions, ICE Officers were also present when Ms. Shemiatina was transported outside of the Basile facility for medical care, including gynecological appointments and hospitalizations.

60. Throughout her detention, Ms. Shemiatina took multiple steps to notify ICE about the unsafe and unsanitary conditions in which she was being held, and about the grossly inadequate medical care she received at Basile which caused her health to severely decline. For example, Ms. Shemiatina submitted complaints to the OIDO that she was not receiving proper medical care. Ms.

17

Shemiatina also submitted numerous Medical Request Forms and facility grievance forms regarding her deteriorating physical and mental wellbeing and Basile's inadequate medical treatment.

61. Finally, as described above, publicly available reports made by detained people and various civil rights groups prior to Ms. Shemiatina's detention regarding the conditions at Basile described exactly the substandard conditions under which Ms. Shemiatina suffered.

**VII. The United States Breached its Duty of Care to Ms. Shemiatina**

62. The conditions in which Ms. Shemiatina was held both at San Ysidro and at Basile fell far short of the minimum required standard of care which ICE owes to detained people in its custody, which is set forth in the Performance-Based National Detention Standards 2011 ("PBNDS").

63. Immigration Officers' violations of the PBNDS included, but were not limited to:

(a) PBNDS rules regarding adequate medical care: PBNDS guidelines require that Immigration Officers provide detained people with health care screening, prevention, diagnosis and treatment, and are obligated to provide timely health care and follow-ups to detained people.[9] Immigration Officers violated PBNDS guidelines by routinely ignoring Ms. Shemiatina's requests for medical care or providing grossly inadequate or inappropriate treatment for Ms. Shemiatina's medical needs. In response to neurological symptoms, Immigration Officers provided Ms. Shemiatina with painkillers. In response to Ms. Shemiatina's gynecological and hormonal symptoms which resulted from Basile's spoiled and

---

[9]    *See* U.S. Immigration and Customs Enforcement, Performance-Based National Detention Standards 2011 [hereinafter "PBNDS"], *4.3 Medical Care*, at 257 ("Detainees shall have access to a continuum of health care services, including screening, prevention, health education, diagnosis and treatment."); *id.* ("Detainees shall be able to request health services on a daily basis and shall receive timely follow-up.").

inedible food, Immigration Officers prescribed Ms. Shemiatina with acne medication, and Ms. Shemiatina requested a vegetarian diet, which Immigration Officers did not accommodate in continuing to serve Ms. Shemiatina meat-based meals. After months of persisting symptoms, Immigration Officers provided kosher meals, which included meat and fish.

(b) PBNDS rules regarding medical treatment at external facilities: PBNDS guidelines require that Immigration Officers promptly transfer detained people requiring health care beyond the facility's resources to external facilities for medical treatment.[10] Immigration Officers violated PBNDS guidelines in delaying scheduling medical appointments at external facilities for Ms. Shemiatina after determining she required off-site gynecological care and in failing to take Ms. Shemiatina to an external facility for treatment of her serious neurological symptoms until she required hospitalization after falling unconscious.

(c) PBNDS rules regarding privacy during medical treatment: Immigration Officers violated PBNDS guidelines requiring Immigration Officers to respect the privacy of detained people in the course of receiving medical treatment by remaining in medical examination rooms with Ms. Shemiatina as she received a gynecological examination and was naked from the waist down.[11]

(d) PBNDS rules governing accommodations for individuals with disabilities:

---

[10] See PBNDS, *4.3 Medical Care*, at 258 ("A detainee who is determined to require health care beyond facility resources shall be transferred in a timely manner to an appropriate facility.").

[11] See PBNDS, *4.3 Medical Care*, at 259 ("Medical and mental health interviews, screenings, appraisals, examinations, procedures and administration of medication shall be conducted in settings that respect detainees' privacy in accordance with safe and/orderly operations of the facility.").

19

PBNDS guidelines require Immigration Officers to ensure detained people with disabilities have access to the facility's programs, services, and activities.[12]  As a result of Immigration Officers' inadequate medical care, Ms. Shemiatina's health deteriorated to the point of partial paralysis, preventing her from bathing or using the restroom independently.  Immigration Officers violated PBNDS guidelines by refusing to aid Ms. Shemiatina in using the restroom or showering, despite her requests for assistance.

(e) <u>PBNDS rules regarding preventing communicable diseases</u>: Immigration Officers violated PBNDS guidelines and CDC guidelines by failing to take steps to protect detained people, including Ms. Shemiatina, from communicable diseases.[13]  Despite the Covid-19 pandemic, Immigration Officers placed detained people in cramped cells, failed to provide masks or hand sanitizer, and failed to administer widely available Covid-19 vaccines.

(f) <u>PBNDS rules governing access to edible food and potable water</u>:  PBNDS guidelines require that Immigration Officers take appropriate actions to ensure that detained people can access food within minimum daily allowances, and that food and water served to detained people be free from contamination.[14]

---

[12]     *See* PBNDS, *4.8 Disability Identification, Assessment, and Accommodation*, at 348 ("The facility will ensure that detainees with disabilities are able to physically access its programs, services, and activities. This includes, for example, ensuring detainees with disabilities can access telephones, as well as toileting and bathing facilities.").

[13]     *See* PBNDS, *4.3 Medical Care*, at 258 ("Centers for Disease Control and Prevention (CDC) guidelines for the prevention and control of infectious and communicable diseases shall be followed."); Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, CDC, https://stacks.cdc.gov/view/cdc/107037 (last updated June 9, 2021); ERO COVID-19 Pandemic Response Requirements, U.S. Immigration and Customs Enforcement and Removal Operations (Nov. 1, 2022), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.

[14]     *See* PBNDS, *4.1 Food Service*, at 232–36 ("Clean, potable water drinking water must be available… The FSA shall base menu selections on the best nutritional program the facility can afford meeting U.S. minimum daily allowances… Food and ice shall be protected from dust, insects and rodents, unclean utensils and work surfaces, unnecessary handling, coughs and sneezes, flooding, drainage, overhead leakage and other sources of

Immigration officers at San Ysidro and Basile failed to serve detained people with enough food to provide adequate nourishment.  At Basile, the food was spoiled and inedible and the water was contaminated and had a chemical smell.

64.   Immigration Officers also fell short of the duty of care they owed Ms. Shemiatina as established by other regulations governing the conduct of federal officers, applicable state law, and the common law.  Louisiana law holds that these standards may establish the relevant standard of care.[15]  For example, Immigration Officers' treatment of Ms. Shemiatina violated FDA Food Code 2022 when they served food to Mr. Shemiatina that was visibly contaminated and spoiled.[16]

65.   Finally, Louisiana law required Immigration Officers to "see that reasonable medical care is provided to a person in [their] custody when the need for such care is indicated by the person's mental or physical condition."[17]  Immigration Officers' repeated failure to provide medical care to Ms. Shemiatina as her health precipitously declined throughout her detention failed that standard.

### VIII.   Ms. Shemiatina Has Exhausted All Administrative Remedies

66.   Pursuant to 28 U.S.C. § 2675(a), on April 29, 2024, Ms. Shemiatina filed an FTCA administrative claim with ICE, DHS, and CBP for all of the tortious actions alleged here.

67.   On October 23, 2024, ICE issued a final decision denying Ms. Shemiatina's claim.

---

contamination").

[15]   *See Merrell v. 1st Lake Properties, Inc.*, 717 F. Supp. 3d 512, 517 (E.D. La. 2024) ("To determine whether a defendant owes a plaintiff a duty, Louisiana courts examine whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty… The Fifth Circuit has recognized that Louisiana law may look to federal statutory and regulatory schemes in delineating the scope of a duty under the duty-risk analysis." (citations and quotations omitted)).

[16]   *See* FDA Food Code 2022 § 3-701.11(A) ("A food that is unsafe… shall be discarded or reconditioned according to an approved procedure." (emphasis omitted)).

[17]   *Phillips v. State, Dept. of Public Safety and Corrections*, 978 So.2d 1223, 1229 (La.App. 2d Cir. 2008); *Evans v. Hawley*, 559 So.2d 500, 505 (La.App. 2d Cir. 1990) ("It is the duty of an arresting officer… and regardless of the nature of the offense for which the arrest is made, so long as the prisoner is in his custody… to see to it that reasonable medical service is provided to such person if and when his mental and/or physical condition discloses the need of such services.") (citing *Cobb v. Jeansonne*, 50 So.2d 100, 106 (La.App. 2d Cir. 1951).

68. Ms. Shemiatina has exhausted all potential administrative remedies.

## CLAIMS

### COUNT ONE: NEGLIGENCE

69. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

70. Defendant United States, independently and through its employees and agents, including Immigration Officers, had a duty to treat Ms. Shemiatina with reasonable care during her detention, including to keep her safe and protect her within reasonable limits from injury not attributable to her own willful acts.

71. Defendant United States' breached the duty of care it owed to Ms. Shemiatina when its employees and agents, including Immigration Officers, engaged in the negligent and careless acts and/or omissions described in detail above.

72. As a direct and proximate result of Defendant United States' negligent conduct, Ms. Shemiatina suffered and continues to suffer pain, physical injury, and emotional distress, as detailed above.

73. The actions and omissions of Defendant United States, independently and through its employees and agents, constitute negligence under Louisiana law.

74. Under the Federal Tort Claims Act, Defendant United States is liable to Ms. Shemiatina for damages caused by such negligence.

### COUNT TWO: NEGLIGENT SUPERVISION

75. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

76. Defendant United States, independently and through its employees and agents, including Immigration Officers, had a duty to treat Ms. Shemiatina with reasonable care during her

22

detention, which included a duty to properly supervise the Immigration Officers responsible for Ms. Shemiatina's care.

77.   Defendant United States breached the duty it owed to Ms. Shemiatina by failing to properly supervise such Immigration Officers.

78.   Defendant United States' negligent supervision proximately caused the unlawful conduct described herein.

79.   As a direct and proximate result of Defendant United States' negligent supervision, Ms. Shemiatina suffered, and continues to suffer, pain, physical injury and emotional distress as detailed above.

80.   Under the Federal Tort Claims Act, Defendant United States is liable to Ms. Shemiatina for negligent supervision of its employees and agents.

## COUNT THREE: ABUSE OF PROCESS

81.   Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

82.   Under binding federal policies, Immigration Officers were required to provide Ms. Shemiatina prompt medical treatment and access to legal counsel.

83.   By withholding access to medical treatment and legal counsel for the purposes of isolating Ms. Shemiatina and punishing her for trying to vindicate her rights to access medical care, Immigration Officers willfully abused established procedures, and acted with ulterior purposes, including purely retributive desires towards Ms. Shemiatina, as described above.

84.   Under the Federal Tort Claims Act, the United States is liable to Ms. Shemiatina for abuse of process.

## COUNT FOUR: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

85.   Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs

23

of this complaint as if fully set forth herein.

86.    Immigration Officers intentionally, recklessly, wantonly, or willfully, while acting within their scope of employment, engaged in extreme and outrageous conduct toward Ms. Shemiatina, as detailed above.

87.    As a direct and proximate result of Immigration Officers' extreme and outrageous conduct, Ms. Shemiatina suffered, and continues to suffer, pain, physical injury, and emotional distress, as detailed above.

88.    The actions and omissions of Defendant United States' employees, and agents constitute intentional infliction of emotional distress under Louisiana law.

89.    Under the Federal Tort Claims Act, the United States is liable to Ms. Shemiatina for intentional infliction of emotional distress.

## COUNT FIVE: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

90.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

91.    Defendant United States, independently and through its employees and agents, including Immigration Officers, had a duty to treat Ms. Shemiatina with reasonable care during her detention, including to keep her safe and protect her within reasonable limits from injury not attributable to her own willful acts.

92.    Defendant United States breached the duty of care it owed to Ms. Shemiatina when its employees and agents, including Immigration Officers, engaged in the negligent and careless acts and/or omissions described in detail above

93.    As a direct and proximate result of Defendant United States' negligent conduct, Ms. Shemiatina suffered, and continues to suffer, injuries including severe emotional distress, manifesting itself in physical reactions and a need for psychological treatment, as detailed above.

24

94. The actions and omissions of Defendant United States, independently and through its employees and agents, constitute negligent infliction of emotional distress under Louisiana law.

95. Under the Federal Tort Claims Act, Defendant United States is liable to Ms. Shemiatina for the negligent infliction of emotional distress.

**COUNT SIX: LOSS OF CONSORTIUM**

96. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

97. Defendant United States, independently and through its employees and agents, including Immigration Officers, tortiously harmed Mr. Shevchuk, causing sustained physical and emotional harm to him.

98. As a result, Ms. Shemiatina has experienced a loss of love and affection, a loss of society and companionship, a loss of performance of material services, a loss of financial support, and/or a loss of aid and assistance.

99. The actions of Defendant United States' employees, officers, and agents caused Ms. Shemiatina a loss of consortium under Louisiana law.

100. Under the Federal Tort Claims Act, the United States is liable to Ms. Shemiatina for loss of consortium.

**JURY DEMAND**

101. Plaintiff requests a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff hereby respectfully requests that the Court:

Upon a final hearing of the cause, enter judgment against Defendant for damages in an amount to be determined within the jurisdictional limits of the Court, together with pre-judgment interest (from the date of injury through the date of judgment) at the maximum rate allowed by

25

law, post-judgment interest at the legal rate, costs of Court, and such other and further relief to

which the Plaintiff may be entitled at law or in equity.

Dated: April 21, 2025
New York, New York

Respectfully submitted,

*/s/ Sarah T. Gillman*
Sarah T. Gillman (Bar No. 706352)
ROBERT F. KENNEDY HUMAN RIGHTS
88 Pine St., Suite 801
New York, NY 10005
(646) 289-5593
(gillman@rfkhumanrights.org)

Sarah Decker *
ROBERT F. KENNEDY HUMAN RIGHTS
88 Pine St., Suite 801
New York, NY 10005
(908) 967-3245
(decker@rfkhumanrights.org)

*Application for admission forthcoming

*Attorneys for Plaintiff Mariia Shemiatina*